# CIRCUIT COURT OF BALTIMORE CITY

Filed January 8, 1894.

JOHN D. KEILEY

VS.

J. J. TURNER, ETC.

*Charles Marshall* for plaintiff.

*Wm. A. Fisher* and *John P. Poe* for defendants.

DENNIS, J.—

When the partnership of which the plaintiff Keiley was a member was dissolved, the new firm took over all the stock on hand at certain prices, crediting him with his proportionate interest at those prices. These prices were arrived at by taking the market value of this stock, in its form as raw material, wholly disregarding the additional value which was given to so much of it as was manufactured by reason of the fact of its being manufactured.

The plaintiff refused to accept this valuation; and at the former hearing of the case, the Court concurred in his view that the goods, in a manufactured state, owing to the reputation of the brand, etc., were worth more than the mere raw material; and that he was entitled to his share of the actual value, in its manufactured state, of so much of the stock as was taken over in that form by the new firm. And accordingly the case was referred back to the auditor to determine the value of the manufactured stock which was

thus transferred; taking into consideration, for the purpose of determining this value, the price at which the goods were sold in their manufactured state, and charging against this the plaintiff's proposition for storage, handling, clerk's hire, bad debts, etc. This ruling was in accordance with what the Court understood was the contention of the plaintiff's counsel at the former hearing; and upon further reflection I am still of the opinion that the prices at which the goods actually sold in their manufactured state is the best and only fair test of their actual value when thus prepared. But, by the testimony taken under this last reference to the auditor, it appears that the whole stock taken over by the new firm, including both the manufactured stock and the raw material, sold for considerably less than the amount at which they were appraised when taken over, after charging against them the expenses of storage, hauling, etc., owing mainly to losses incurred upon a large shipment of the fertilizers to New Orleans, with a proportionate part of which losses on the entire stock the auditor has charged the plaintiff. This was correct and in accordance with the instructions given by the Court.

The plaintiff had his option either to accept the appraisement of the stock taken made by his former partners, or to reject it, and he chose to reject it, and to insist upon a settlement based upon what the actual value of the stock might be shown to be. As has been said above, no better proof of what this value was can be had than the prices at which the stock actually sold. The method suggested by the plaintiff, viz: taking the prices at which certain lots sold during the two or three years previously, and adopting them as furnishing a true and first measure of the value of the same class of goods at the time of the dissolution, is altogether illusory and unsatisfactory; and while perhaps it might have to be resorted to, from the necessity of the case, if no other means of determining these values existed, it cannot be allowed when we have the means of knowing them with exactness and precision, by reason of having before us the prices at which the goods actually sold in the open market.

The plaintiff having rejected the valuation of the goods based upon the cost of the raw materials, and having elected to have the account stated based upon their value in their manufactured state, must stand by this election as to the whole stock.

He cannot be allowed to claim the manufactured value where there is a profit, and to reject it and insist upon the goods being taken at the value of the raw material, where there is a loss in their manufactured state. He must, therefore, stand his proportion of the loss on account of the New Orleans shipment.

I think the testimony clearly shows that 110½ tons of the New Orleans shipment belonged to J. J. Turner, Sr., individually, and was added to the 510½ tons belonging to the firm simply for the purpose of completing the cargo. The plaintiff contends that the whole cargo belonged to the firm, and that the claim of Mr. Turner to an individual ownership of the 110½ tons, was a deliberate attempt to defraud the plaintiff of his share in that much of the cargo, and to support the contention that Turner did not own individually the 110½ tons, he relies solely upon certain inferences which he seeks to draw from exhibit F. A. &c., No. 4. Now this paper was a statement prepared by Mr. Turner by the bookkeeper from the books, showing the value at cost of the stock owned by J. J. Turner, Sr., on the 2d of January, 1883, with a view to his placing it as capital with the new firm which began on January 24, 1883. In it, all the raw material belonging to him were put down; and it was argued that they could not have embraced the 110½ tons which were shipped in a manufactured state in November.

But it is apparent, from an inspection of the paper itself and the testimony of Luchesi, that what was done was to take down at cost the 510½ tons which were taken over from the old firm at the price fixed on them, and then, in place of stating the other 110½ tons, the cost of the materials entering into them was taken from the books and put upon the statement. Moreover, the books of the firm show that they belonged to J. J. Turner, Sr., individually, and the fact is further positively testified to by both Luchesi and Lewis, neither of whom has any

interest in the matter; and their testimony is strongly corroborated by the fact that there is on the books a charge against J. J. Turner, Sr., individually, for hauling 112 tons of phosphate at the very time this shipment of the 620½ tons was made.

Mr. Turner's well-known character as an honorable merchant is also entitled to weight in refutation of this attack upon his integrity thus brought forward for the first time so many years after his death. He had greatly befriended the plaintiff, who was his son-in-law, and there does not appear to have been any ill-feeling between them; and it is difficult to believe, unless forced to the conclusion by clear and unequivocal testimony, that he would be so false to himself and to his previous life as to perpetuate so base a fraud upon one so closely connected with him, and it is equally incredible that two witnesses with no interest in the matter should now deliberately perjure themselves in order to render the fraud successful.

At the former hearing the Court did not pass specifically upon the question of salaries, and as the counsel upon both sides have considered the subject still open, and have argued it anew, I will so treat it.

The articles of copartnership provided that each member of the firm should receive a salary of $150 per month. The plaintiff claims that by a secret agreement between himself and J. J. Turner, Sr., he was to receive, in addition to his own salary, the $150 which was allowed to J. J. Turner, Sr., although it was to be credited to Turner upon the books. This was done without the knowledge of J. J. Turner, Jr., the other partner, and in fact for the purpose of deceiving him; as it was feared he would be dissatisfied and would refuse to enter into the copartnership, if he knew the plaintiff's salary was so much greater than his own.

Assuming that this argument is fully established by the proof, it was a matter wholly outside of the partnership, and nothing more than a private agreement between the two parties in their individual capacities, and in no way binding upon the other partner; and hence cannot be considered in a suit for the settlement of partnership accounts between the three. The bill is clearly multifarious as to this claim; and whatever rights the plaintiff may have under the agreement he must prosecute against the individual estate of J. J. Turner, Sr.

There is one other question in regard to the salaries. The plaintiff claims that in 1881 it was arranged between himself and J. J. Turner, Sr., in order to check the extravagance of the other members of the firm, that on the 1st of August of that year, the salaries of all the members of the firm should cease, and should no longer be charged upon the books, but that at the same time it was *secretly agreed* between them that the salaries should actually go on, notwithstanding the books would not show the fact; and in pursuance of this secret agreement between himself and J. J. Turner, Sr., he now claims his salary from August 1st, 1881, up to the close of the partnership. A part of this agreement was made known to the third partner, J. J. Turner, Jr., he was told it had been agreed that the salaries of the several members of the firm should cease on the 1st of August, but the latter part of the agreement was carefully concealed from him. J. J. Turner, Jr., assented to the agreement that the salaries should cease on the 1st of August; and accordingly, by the direction of the plaintiff himself to the bookkeeper, they ceased to be entered upon the books, and from that date J. J. Turner, Jr., has neither received or claimed any salary. To state the proposition that, under such circumstances, the plaintiff should now claim his salary in full from the date agreed upon by all the partners for its cessation, viz: August 1st, 1881, up to the date of the dissolution of the copartnership, would seem to be sufficient for its own refutation. The secret agreement between the two partners that the salaries should still continue, notwithstanding their open agreement with J. J. Turner, Jr., that they should cease, was a deception practiced upon the latter, and therefore a fraud upon his rights as partner; and a Court of equity will no more tolerate concealments between partners than they will between trustees and cestui que trusts. The proposition made to J. J. Turner, Jr., was that the salaries should actually cease on August 1st; this proposi-

tion was accepted by him and acted upon, and it thus became a binding contract upon all the partners, and to that extent worked a modification of the articles of copartnership; and the secret understanding between the other partners that the salaries should still continue was void as against the third partner, and cannot be considered in the settlement of the partnership accounts.

The plaintiff had a right to file this bill for the settlement of the partnership affairs, and ordinarily would be allowed his costs; but as it appears from the testimony that during the progress of the case the defendants tendered him a very much larger amount than an account stated upon the principles above announced will show to be due, it will be ordered that he be allowed costs only up to the time of the tender, and that all subsequently accruing costs be allowed to the defendants.